# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 26, 2002 Session

## STATE OF TENNESSEE v. JIMMY BUCK

### Direct Appeal from the Criminal Court for Anderson County
### No. AOCR116C     James B. Scott, Judge

---

### No. E2002-00631-CCA-R3-CD
### January 12, 2004

---

An Anderson County grand jury indicted the defendant and two co-defendants on a single count of aggravated robbery. While one co-defendant pled guilty to a reduced offense, the defendant and remaining co-defendant elected a jury trial. Following the close of proof, the trial court jury found these two individuals guilty as charged. For this offense the lower court sentenced the defendant to ten years as a standard offender. Thereafter the defendant unsuccessfully pursued a new trial motion. In this appeal the defendant continues to assert that his conviction cannot be upheld because it is based on the uncorroborated testimony of a co-defendant.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court is Affirmed.

JERRY L. SMITH, J., delivered the opinion of the court, in which GARY R. WADE, P.J.,and NORMA MCGEE OGLE, J., joined.

Mark S. Cizek, Clinton, Tennessee, for the appellant, Jimmy Buck.

Paul G. Summers, Attorney General & Reporter; Peter M. Coughlan, Assistant Attorney General; James N. Ramsey, District Attorney General; and Jan Hicks, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### Factual Background

No dispute exists that on the night of March 12, 2000, two masked men entered the home of James Taylor through an unlocked back door. Taylor testified that the larger of the two assailants was about the same size as the defendant in this case and that the smaller was approximately the same size as the co-defendant, Jackie Lee McGhee. The victim, also known as "Taterbug," further related that the larger assailant was armed with a shotgun and ordered Taylor to the floor. Though the victim had a loaded pistol under the cushion of his chair, he decided to comply with this demand. The assailants then tied up the victim using electrical wire, took over thirteen hundred dollars from

the victim's wallet in his pants pocket, and stole an additional sixty dollars in rolled quarters from the victim's chifforobe. Thereafter the smaller assailant placed a coat under the victim's head and the screen in front of the lit fireplace before the pair exited through the same door by which they had entered.

Within a couple of minutes, the victim untied himself, picked up his pistol, and got into his truck thinking that he might be able to apprehend the perpetrators. On the way out of the narrow dead-end street on which he lived, the victim stopped a car coming toward his home, put his pistol to the driver's head, and told the driver to take him out to the main road. The victim believed that the driver was going to pick up the people who had robbed the victim and wanted to go with the driver to do so. However, Jarrod Copeland, the driver, refused to comply; thus, Taylor blocked Copeland's vehicle and went to nearby home to have a neighbor call the police. He then returned and ultimately waited with Copeland, who had not attempted to flee, for the authorities to arrive. While at that time Copeland had not admitted his involvement to Taylor, Taylor believed that Copeland had been involved with the robbery because Taylor had heard a car sounding like Copeland's vehicle drive by his home before the intruders had entered.

Upon subsequent questioning by the police, Copeland at first continued to deny that he had played a role in the robbery but eventually confessed to serving as the driver. Copeland explained that on the evening of the robbery, he, his wife Nicole, her son Harley, Tim Jenkins, and Jack McGhee were at Copeland's home when McGhee received a telephone call from the defendant. Shortly after dark the defendant arrived at Copeland's residence, where the defendant and McGhee discussed details of executing the robbery such as who was to carry the weapon, who would tie up the victim, and who the planned victim was to be. Copeland further stated that McGhee and the defendant talked to him about driving them to the robbery site, since Copeland had a driver's license. The record also reflects that the only car at Copeland's home on that night belonged to Copeland's wife.[1]

According to Copeland, McGhee went to Copeland's bedroom to retrieve a sawed-off shotgun before the three left with Copeland driving as directed by McGhee. At some point down the road on which the victim lived, Copeland stopped for McGhee and the defendant to get out of the car. As they did so, Copeland noticed that McGhee had the sawed-off shotgun[2] and that both were wearing ski masks. The plan was for Copeland to return in fifteen minutes to pick up the pair after the robbery; however, when he came back, he saw neither the defendant nor McGhee. He left and subsequently returned to look for them but was stopped by the victim, who held a gun to his head and correctly accused him of dropping off the robbers. As previously mentioned, Copeland then waited with Taylor for the arrival of the police. Though Copeland explained that the robbery proceeds were to be split three ways, he claimed that he had never received any money from the offense, and the record reflects that the victim never recovered any of the sum taken.

Tim Jenkins also testified at trial. This individual was both a distant cousin of the defendant's and someone who had been sharing expenses to stay at Copeland's residence in the days preceding

---

[1] Both Copeland and his wife testified that the car was hers though his wife added that the vehicle was registered in her father's name.

[2] The victim recovered this weapon approximately two weeks later off the side of the road less than a quarter of a mile from his home.

the offense. While proving a reluctant witness for the State, he confirmed that McGhee and the defendant were at Copeland's home on the evening of the offense and that he found himself home alone with Nicole[3] and her older child when he was awakened by the authorities at around 12:30 a.m. the following morning. On cross-examination, this witness acknowledged that he had a probation matter pending but stated that no promises had been made to him in exchange for his testimony.

Nicole Copeland next gave testimony concerning the period of time surrounding the offense. This witness stated that while McGhee was visiting her home on the date of the crime, she overheard a portion of a telephone conversation involving him. According to Nicole she had heard McGhee ask, "Are we gonna [sic] do that?" After McGhee hung up the telephone, Nicole asked with whom he had been speaking, and McGhee told her the defendant's name. As it began to get dark, the defendant arrived at her home. While Copeland, McGhee, and the defendant talked, Nicole went to take a bath. When she finished doing so, these three men were gone, and only she, her son Harley, and Jenkins remained at the trailer. Nicole stated that while she had been in the bath, her husband had told her that "they was [sic] going to a friend's house," and she affirmed that she had then heard the car leave. While testifying, she also identified a photograph of the car involved and indicated that the weapon found by the victim belonged to her husband.

Regarding the conversation among the men that evening at the trailer, Nicole first claimed to remember nothing until the prosecution refreshed her recollection with a prior statement that she had given within days of the offense. Though she maintained that she did not understand what was going to happen, she did recall McGhee's asking the defendant "if they was [sic] gonna [sic] do this or what" to which the defendant replied that they were and that he had "already checked it out and it was going to be alright." She also remembered one of them stating that "Taterbug" was to be involved. While she did not know this individual personally, she knew about whom they were talking because she had grown up in the community in which the victim lived, and she was able to identify the victim in court. She added that she had heard someone tell her husband[4] that he did not have to do anything other than drive "there" and drop off the defendant and McGhee.

Both the defendant and McGhee sought to convince the jury that they did not take part in the robbery and that they were not even at Copeland's trailer on the evening of the offense. In attempting to explain why Copeland would allege that they had been involved in the robbery, the defendants both testified that prior to the date of the offense, Copeland had accused them of stealing some of his marijuana plants.

The defendant also offered testimony from Brianna Chamberlain, his girlfriend, and Frank Ernest Scott, his step-father, regarding his whereabouts on March 12th. Chamberlain stated that on that evening the defendant had accompanied Scott and her to Kingston, Tennessee, to test drive an automobile which she later purchased. She indicated that she had left the defendant at his brother's duplex in Oak Ridge, Tennessee, sometime between 9:30 and 10:00 p.m. According to her

---

[3] Because we have previously referred to Jarrod Copeland by his last name alone and, in an effort to avoid confusion, we will refer to Nicole Copeland by only her first name. We mean to imply no disrespect in so doing.

[4] When asked, she stated that she believed her testimony could both assist and be detrimental to her husband, with whom she no longer resided, in his pending sentencing hearing.

testimony the defendant had no car of his own at the time.[5] Scott's testimony essentially corroborated many of these details.

After hearing this and additional proof including evidence offered by other witnesses, the jury convicted the defendant of aggravated robbery. Through this appeal the defendant seeks relief from his conviction.

## Corroboration of Accomplice Testimony

As previously stated, the defendant claims that insufficient evidence exists to corroborate the testimony of Jarrod Copeland, undisputedly an accomplice to the offense in this case. We, thus, begin our analysis by acknowledging the well-settled law of this state that convictions may not be based solely upon the uncorroborated testimony of accomplices. See State v. Robinson, 971 S.W.2d 30, 42 (Tenn. Crim. App. 1997). However, Tennessee law requires only a modicum of evidence in order to sufficiently corroborate such testimony. See State v. Copeland, 677 S.W.2d 471, 475 (Tenn. Crim. App. 1984). More specifically, precedent provides that

> [t]he rule of corroboration as applied and used in this State is that there must be some evidence independent of the testimony of the accomplice. The corroborating evidence must connect, or tend to connect the defendant with the commission of the crime charged; and, furthermore, the tendency of the corroborative evidence to connect the defendant must be independent of any testimony of the accomplice. The corroborative evidence must[,] of its own force, independently of the accomplice's testimony, tend to connect the defendant with the commission of the crime.

State v. Griffis, 964 S.W.2d 577, 588-89 (Tenn. Crim. App. 1997) (quoting Sherrill v. State, 204 Tenn. 427, 321 S.W.2d 811, 814 (Tenn. 1959)). In addition, our courts have stated that

> [t]he evidence corroborating the testimony of an accomplice may consist of direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. The quantum of evidence necessary to corroborate an accomplice's testimony is not required to be sufficient enough to support the accused's conviction independent of the accomplice's testimony nor is it required to extend to every portion of the accomplice's testimony. To the contrary, only slight circumstances are required to corroborate an accomplice's testimony. The corroborating evidence is sufficient if it connects the accused with the crime in question.

Griffis, 964 S.W.2d at 589. Furthermore, we note that the question of whether an accomplice's testimony has been sufficiently corroborated is for the jury to determine. See id. at 588; State v. Maddox, 957 S.W.2d 547, 554 (Tenn. Crim. App. 1997) .

After reviewing the instant record, we find sufficient corroboration to uphold the defendant's conviction. Nicole Copeland's testimony indicated that on the night of the offense, she overheard one side of a telephone conversation involving McGhee in which McGhee asked, "Are we gonna

---

[5] Chamberlain stated that the defendant's mother had given them a ride to meet Scott, who was working on the above-referenced duplex. Scott then took them to look at the aforementioned car.

[sic] do that?" She further stated that after the conversation had ended, she had asked McGhee with whom he had been speaking, and he had told her the defendant's name. Nicole added that shortly thereafter the defendant had joined McGhee and others at her home. Though at first she could not recall additional significant details from the night's discussion between her husband, McGhee, and the defendant, the State succeeded in refreshing her recollection with a prior statement. She then testified that the she had heard "Taterbug," the victim's nickname, mentioned; the defendant assuring someone that he had "already checked . . . out [what they were planning to do] and it was going to be alright"; and someone telling her husband that he was merely to drop them off and pick them up. Nicole also provided that while she was in the bathroom, her husband came to tell her that "they was [sic] going to a friend's house." The witness subsequently heard the car identified as being involved in the robbery leave. She further related that upon later exiting the bathroom, she found herself home alone with Jenkins and her son Harley.

Beyond this, the State offered the testimony of Tim Jenkins and the victim. While Jenkins did not prove extremely helpful to the prosecution, he did place both the defendant and McGhee at Copeland's home on the evening of the 12th. This obviously contradicts the defense's claim that McGhee and the defendant were elsewhere that night. Jenkins' testimony further supports that only he, Nicole, and Harley were at the home when the police entered the residence in the early morning hours of the 13th. Additionally, though the ski masks[6] prevented the victim from conclusively identifying his assailants, the victim was able to testify that McGhee and the defendant were approximately the same size as his attackers.

Faced with these facts, we find that evidence independent of Copeland's testimony[7] connects the defendant with this aggravated robbery; thus, sufficient corroboration exists to support the defendant's conviction. This issue merits no relief.

## Conclusion

For the above-stated reasons, we find that the defendant's claim lacks merit. We, therefore, AFFIRM his conviction.

_____
JERRY L. SMITH, JUDGE

---

[6] Copeland stated that McGhee and the defendant had donned ski masks before approaching the victim's home, and the victim confirmed that his assailants had worn ski masks.

[7] In previous proceedings the defendant had asserted that Nicole and Jenkins could have been considered by the jury to be accomplices. However, the defendant does not make this argument on appeal focusing more on Nicole's possible bias, inconsistencies in her testimony, etc.